IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COTTMAN TRANSMISSIONS SYSTEMS, LLC | : <br> : CIVIL ACTION <br> : |
| v. | : NO. 12-cv-05223 <br> : |
| MICHAEL GANO, ET AL. | : |

**MEMORANDUM**

YOHN, J.  March 6 , 2013

On September 12, 2012, Cottman Transmissions Systems, LLC ("Cottman") brought suit against Michael Gano ("Gano") and 412 Automotive, L.P. ("412 Automotive") (collectively, the "Defendants"), alleging trademark infringement, unfair competition, fraud and deceit,[1] and breach of contract.  Cottman moved for a preliminary injunction on September 19, 2012, asking the court to enjoin the Defendants from using the Cottman name in the performance of any of its services, and to enforce a noncompete clause under the License Agreement.  When Gano failed to answer Cottman's complaint, Cottman moved for a default judgment pursuant to Federal Rule of Civil Procedure 55.  On January 28, 2013, I held a hearing for Cottman's request for a final injunction and to assess damages.  Gano again failed to appear to defend.  Having considered Cottman's testimony and exhibits offered into evidence, as well as its written submissions, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

---

[1]Cottman did not provide any testimony concerning its claim of fraud and deceit at the hearing on January 28, 2013.  Furthermore, there was no mention of that claim in Cottman's proposed Findings of Fact and Conclusions of Law.  Therefore, I assume this claim is withdrawn.

I. **FINDINGS OF FACT**

    A. **Service of Process**

1. Michael Gano is an adult individual who was personally served in connection with this matter on two separate occasions by the same process server, Dennis Heath, Jr. On October 4, 2012, Gano was served with the Summons and Complaint in this matter at his place of business: 4518 State Route 136, Greensburg, Pennsylvania 15601. (Aff. of Serv., Oct. 4, 2012, ECF No. 6.) On November 18, 2012, Gano was personally served at his residence located at 357 Elm Dr., Greensburg, Pennsylvania 15601, with the court's Order of September 19, 2012, which stayed Cottman's motion for a preliminary injunction until service was effected, along with Cottman's motion for a preliminary injunction. (Aff. of Serv., Nov. 18, 2012, ECF No. 11.)

2. On October 4, 2012, 412 Automotive was served with the Summons and Complaint by Heath at 4518 State Route 136, Greensburg, Pennsylvania 15601. (Aff. of Serv., Oct. 4, 2012, ECF No. 7.) On November 5, 2010, it was served with the court's Order of September 19, 2012, and Cottman's motion for a preliminary injunction at the same address. (Aff. of Serv., Nov. 5, 2012, ECF No. 12.)

3. Though he failed to answer the complaint or appear in court to defend the allegations against him, Gano was fully aware of this suit and the court's proceedings. (Decl. of William B. Johnson, ECF No. 14-1.)

    B. **Cottman Trade Name and Trademarks**

4. Since 1963, Cottman has continually used the name "Cottman" as its trade name, trademark, and service mark in connection with the operation of its transmission and

        automotive repair centers.  (Pl.'s Ex. P-1 ¶ 3; Wright Test.)

5. Cottman is the owner of said marks, which are registered on the principal register of the United States Patent and Trademark Office.  (Pl.'s Ex. P-1 ¶ 4; Wright Test.)

6. Cottman is engaged in interstate commerce through its business of franchising and licensing other entities to use the mark and "Cottman" name in the operation of transmission repair centers throughout the United States.  (Pl.'s Ex. P-1 ¶ 5; Wright Test.)

7. The "Cottman" trade name and trademark have become universally associated with the repair of motor vehicle transmissions and the operation of transmission repair centers.  (Pl.'s Ex. P-1 ¶ 6; Wright Test.)

8. Cottman has a vital interest in protecting its trade name and trademarks, and the preservation and protection thereof are essential to the maintenance of Cottman's quality transmission repair centers and the goodwill and reputation associated therewith.  (Pl.'s Ex. P-1 ¶ 10; Wright Test.)

        **C.    License Agreement**

9. On December 16, 2008, Cottman and Gano entered into a License Agreement, pursuant to which Gano was authorized to use the name and mark "Cottman" in connection with the operation of an automotive repair center (the "Center") located at 4518 State Route 136, Greensburg, PA 15601.  (Pl.'s Ex. P-2; Wright Test.)

10. Gano executed a Transfer of License with Cottman, whereby the License Agreement was assigned to 412 Automotive, which agreed to assume and become liable for the obligations of Gano.  (Pl.'s Ex. P-2, p. 24.)  The Transfer of License provides that notwithstanding the transfer to 412 Automotive, Gano shall remain "personally liable in

all respects under the License Agreement" to Cottman.  (*Id*.; Wright Test.)

11. As provided under the License Agreement, Cottman shared with the Defendants its proprietary systems and manuals, customer lists, software, and trade secrets for operating a successful automotive repair business.  (Pl.'s Ex. P-1 ¶¶ 16-17; Wright Test.)

12. In the spring of 2010, Cottman audited the Defendants' Center and discovered that they were underreporting sales to Cottman in order to escape payment of license fees due and owing to Cottman.  (Pl.'s Ex. P-1 ¶ 18; Wright Test.)  Defendants were also issuing non-Cottman repair orders to customers.  (Pl.'s Ex. P-1 ¶ 19; Wright Test.)

13. On February 23, 2012, Cottman performed another audit of the Defendants' Center and again discovered that Defendants continued to underreport sales and underpay franchise fees.  (Pl.'s Ex. P-1 ¶ 22; Wright Test.)

14. In a letter dated March 20, 2012, Cottman notified the Defendants that they were in material breach of the License Agreement and must pay all sums due and owing to Cottman within ten days.  (Pl.'s Ex. P-3; Wright Test.)  Defendants failed to comply with Cottman's demand for payment.  (Pl.'s Ex. P-1 ¶ 28; Wright Test.)

15. In a letter dated April 30, 2012, Cottman terminated the License Agreement for the Defendants' failure to pay sums due and owing to Cottman.  (Pl.'s Ex. P-4; Wright Test.)

16. Pursuant to the License Agreement, upon termination "for any reason" the Defendants were to pay all amounts owed to Cottman; discontinue the use of all Cottman names, marks, forms of advertising, signage, and structures; return to Cottman all proprietary information, including manuals and software; and make no representations that the Defendants are or continue to be approved, endorsed, or licensed by or associated with

Cottman.  (Pl.'s Ex. P-2, p. 17.)

17. The License Agreement also states with particularity the terms of the "Covenant Not to Compete."  Specifically, upon termination of the License Agreement, the Defendants agreed not to begin or engage in any business the same, similar to, or in competition with the business of the Center for a period of two years within a specified geographical range. The specified range was within a ten-mile radius of the Defendants' former Center and a three-mile radius of any other Cottman center in existence at the time of the License Agreement termination.  (Pl.'s Ex. P-2, p. 18.)  The License Agreement also states that if the Defendants do not obey the terms of the noncompete agreement upon termination of the License Agreement, thus forcing Cottman seek equitable relief through the judicial system, then the noncompete agreement will remain in effect for a period of two years from the date that such relief is granted.  (Pl.'s Ex. P-2, p. 19.)

18. As of January 28, 2013, Defendants had neither paid Cottman the sums owed pursuant to the License Agreement, nor discontinued their use of the Cottman marks, proprietary information and manuals, signage, letterhead, and warranties.  (Pl.'s Exs. P-5 to P-8.)

**D.     Damage to Cottman's Good Will**

19. The Center was originally established under the Cottman trademark in September of 1996, and has been continually advertised as a Cottman center since.  (Pl.'s Ex. P-1 ¶ 15; Wright Test.)

20. Defendants did not become Cottman franchisees until several years after the Center was established and after the business was already known in the community as "Cottman." (Pl.'s Ex. P-1 ¶ 34; Wright Test.)

21. Cottman has two other Cottman Transmission Centers in the Greater Pittsburgh Area,[2] where Defendants' Center is located.  (Wright Test.)

22. By continuing to operate a transmission repair business at the former Center location in Greensburg, Pennsylvania, Defendants are benefitting from the reputation and goodwill that Cottman has developed in the Greensburg community.  (Pl.'s Ex. P-1 ¶ 32; Wright Test.)

23. Customers continue to patronize the Defendants' Center under the belief that the Center is affiliated with Cottman and that all work is guaranteed pursuant to a Cottman warranty.  (Pl.'s Ex. P-6 to P-9.)  Thus, it is evident that confusion over the Defendants' use of the "Cottman" marks exists.

24. In addition, because Defendants continue to operate from a former Cottman Transmission Center with access to Cottman proprietary information and trade secrets, Cottman has not been able to find a potential franchisee to open a competing Cottman center, as any franchisee would be at an unfair and possibly economically detrimental disadvantage.  (Wright Test.)

25. Cottman maintains a strong interest in the ability to police its franchisees.  This interest also serves the public interest as customers may maintain the peace of mind that they are receiving repair parts and warranties from a bona fide Cottman Transmission Center.  (Pl.'s Ex. P-1 ¶¶ 43, 47; Wright Test.)

---

[2]The Greater Pittsburgh Area consists of Allegheny, Armstrong, Beaver, Butler, Fayette, Washington, and Westmoreland counties.

### E. Economic Damages

26. Under the License Agreement, Defendants were required to pay Cottman a continuing license fee equal to 7.5% of the gross business transacted at the Center. (Pl.'s Ex. P-2 ¶ 8.a; Wright Test.; Freeman Test.) When Cottman does not receive the Defendants' weekly Center sales report, it is entitled to estimate sales based on an average of weekly gross sales from previous weeks. (Pl.'s Ex. P-2 ¶ 8.d; Wright Test.; Freeman Test.)

27. Under the Licensing Agreement, Defendants were also required to pay Cottman a continuing advertising fee in the amount of $750.00 per week. (Pl.'s Ex. P-2 ¶ 9.a; Wright Test.; Freeman Test.)

28. Returned electronic funds transfers ("EFTs") are electronic withdrawals initiated from Defendants' bank account but later rejected by the Defendants' banking institution. In such situations, Cottman debits the returned payment under the heading "Returned EFTs." (Wright Test.; Freeman Test.)

29. Defendants did not make any payments to Cottman after March 20, 2012. (Wright Test.; Freeman Test.)

30. As of April 30, 2012—the date of the termination of the License Agreement—the Defendants owed Cottman the following:

| | |
|---|---|
| Franchise fees (estimated from unreported weeks) | $1,363.29 |
| Advertising fees | $9,750.00 |
| Returned EFTs, late fees and misc. | $3,524.14 |
| TOTAL | $14,637.43 |

(Pl.'s Ex. P-10; Wright Test.; Freeman Test.)

## II.     CONCLUSIONS OF LAW

1.   Cottman alleges trademark infringement and unfair competition under 15 U.S.C. § 1125 of the Lanham Act, and unfair competition and breach of contract under Pennsylvania law.  It seeks monetary damages, attorney fees, and a permanent injunction that would prohibit the Defendants from continuing to use any and all "Cottman" marks and would enforce the noncompete agreement, as stated in the License Agreement.

### A.     The Lanham Act

2.   "The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir. 2004) (quoting 15 U.S.C. § 1114(1)).

3.   "[It] was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in . . . commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-78 (1992) (quoting 15 U.S.C. § 1127).

4.   To prove trademark infringement or unfair competition under the Lanham Act, "a plaintiff must show that: (1) the mark is valid and legally enforceable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origins of the goods or services." *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005) (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 202 (3d Cir. 1999)) (internal quotation marks omitted).

5.   As stated above, Cottman is the owner of the marks at issue.  It has provided sworn

affidavits that it is the owner of the marks and that the marks are valid and legally enforceable, which a basic search of the U.S. Patent and Trademark Office's database confirms, thus satisfying the first two elements under the Lanham Act. (Pl.'s Ex. P-1; Wright Test.)

6. With respect to the third element, "[a] likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Freedom Card*, 432 F.3d at 470 (quoting *A&H Sportswear*, 237 F.3d at 211) (internal quotation marks omitted). "'When an infringer uses the exact trademark' as the plaintiff," as is the case here, "'there is a great likelihood of confusion.'" *S & R Corp. v. Jiffy Lube Intern, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (quoting *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)); *see Opticians*, 920 F.2d at 195 ("Thus, likelihood of confusion is inevitable, when . . . the identical mark is used concurrently by unrelated entities.").

7. Therefore, because the Defendants continue to use the "Cottman" marks, and additionally because Cottman has provided evidence that such confusion is manifest amongst its customers, I conclude that the Defendants are in violation of the Lanham Act pursuant to 15 U.S.C. § 1125.

    **B.    Common Law Unfair Competition**

8. "A Pennsylvania common law cause for unfair competition is identical to the Lanham Act, without the federal requirement of interstate commerce." *R.J. Ants, Inc. v. Marinelli Enterprises, LLC*, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011) (citing *Allen-Myland v. Int'l*

      *Bus. Machs. Corp.*, 746 F. Supp. 520, 553 (E.D. Pa. 1990)*; Moore Push-Pin Co. v. Moore Business Forms, Inc.*, 678 F. Supp. 113, 116 (E.D. Pa. 1987)).

9. Accordingly, because I have concluded that the Defendants are in violation of the Lanham Act, it follows that they are also in violation of unfair competition under Pennsylvania common law.

      **C.    Breach of Contract**

10. "Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

11. As stated above, Gano signed a License Agreement with Cottman and transferred the rights and duties under that agreement to 412 Automotive, but ultimately remained personally liable in all respects under the License Agreement. (Pl.'s Ex. P-2, p. 24.) The Defendants breached their duty under the License Agreement when they failed to pay the franchise and advertising fees. This breach resulted in a monetary loss to Cottman of $14, 637.43.

12. Based on the evidence provided by Cottman, I conclude that the Defendants did breach their contract with Cottman, and therefore owe Cottman $14,637.43 in compensatory damages.

      **D.    Permanent Injunction and Noncompete Agreement**

13. Due to the Defendants' violation of the Lanham Act and associated common law claims,

      Cottman requests a permanent injunction to prevent the Defendants from further using in any manner any "Cottman" proprietary marks and to return to Cottman all proprietary information and materials still in the Defendants' possession. Cottman also seeks to enforce the noncompete agreement from the License Agreement, which would prevent the Defendants from operating or continuing to operate an automotive repair business within ten miles of Defendants' Center and within three miles of any other Cottman Transmission Center for a period of two years.

14. "A permanent injunction issues to a party after winning on the merits and is ordinarily granted upon a finding of trademark infringement." *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996).

15. In seeking a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc.v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

16. Cottman has suffered an irreparable injury due to the finding that, through the Defendants' continued use of the "Cottman" marks, confusion exists amongst customers who continue to patronize the Defendants' Center. *See S & R Corp.*, 968 F.2d at 375 ("We have held that 'there is a great likelihood of confusion when an infringer uses the exact mark' as the plaintiff."); *id*. at 378 ("[T]rademark infringement amounts to irreparable injury as a matter of law.").

17. Other remedies available at law, such as monetary damages, are inadequate because they may not be sufficient to deter the Defendants from continued infringement. *See Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 585 (E.D. Pa. 2002).

18. The balance of hardships also weighs in favor of granting the injunction, as any detriment suffered by the Defendants due to the injunction would be self-inflicted harm. *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("[T]he injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought the injury upon itself.").

19. Finally, an injunction in this case would not disserve the public interest, but rather would benefit the public interest through the protection of trademarks and guarding against public deception. *See Opticians Ass'n of Am.*, 920 F.2d at 197 ("Public interest can be defined in a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused."); *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984) ("[T]he public interest is advanced by recognition of property interests in trademarks. Thus the public interest is advanced by preventing the erosion of the value of such interests.").

20. Therefore, because Cottman has satisfied the elements required for a permanent injunction to be issued, and because 15 U.S.C. § 1116 vests courts with the power to grant injunctions for trademark violations in accordance with the principles of equity, I conclude that a permanent injunction would be appropriate in this matter.

21. Under Pennsylvania law, "in order to be enforceable a restrictive covenant must satisfy

22. three requirements: (1) the covenant must relate to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) the covenant must be supported by adequate consideration; and (3) the application of the covenant must be reasonably limited in both time and territory." *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210 (Pa. 1976).

22. The Supreme Court of Pennsylvania has stated that Pennsylvania law "permit[s] the equitable enforcement of a covenant not to compete included in a franchise agreement where the restrictions are reasonably necessary for the protection of the franchisor without imposing undue hardship on the franchisee and the restrictions are reasonably limited as to duration of time and geographical extent." *Id.* at 212.

23. In order for a non-competition agreement "[t]o be reasonably necessary for the protection of the employer, a covenant must be tailored to protect legitimate interests." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (applying Pennsylvania law). "Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills." *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa. 2002). Furthermore, "the existing franchise itself is a legitimate business interest and therefore protectable." *Piercing Pagoda, Inc.*, 351 A.2d at 211. Here, Cottman has provided ample evidence that the Defendants' continued use of the "Cottman" trademark is affecting its goodwill. Furthermore, Cottman has shown that through the continued operation of their Center, the Defendants continue to use Cottman's trade secrets and proprietary information for their own benefit and to the detriment of Cottman. The non-competition agreement only prevents the Defendants

from engaging in a business "the same as, or similar to, or in competition with" another Cottman center. Therefore, I find the scope of the covenant reasonable to protect Cottman's goodwill and confidential information. *See Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, No. 96-306, 1996 WL 165518, at *4 (E.D. Pa. Apr. 8, 1996) (finding protection of product for which trade name and goodwill had value to be reasonable in scope).

24. Based on Pennsylvania precedent, I find the two-year duration of the non-competition to be reasonable. In similar franchise agreements, the Supreme Court of Pennsylvania has found restrictive covenants lasting up to three years to be reasonable. *See Piercing Pagoda*, 351 A.2d at 213.

25. I also find the non-competition agreement's geographical limitation to be reasonable, but only as it relates to the Greater Pittsburgh Area. Courts have found as reasonable a geographical restriction of a ten-mile radius from the infringing store location in similar situations, where the store at issue was an automotive repair center. *See AAMCO Transmissions, Inc. v. Dunlap,* No. 11-4009, 2011 WL 3586225, at *8 (E.D. Pa. Aug. 16, 2011); *Maaco Franchising, Inc. v. Augustin*, No. 09-4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010). It is also reasonable to restrict competition with other franchise centers within the same geographical area. *See, e.g., Rita's Water Ice*, 1996 WL 165581, at *4. However, a restrictive covenant that would limit competition within three miles of any other Cottman center in the United States, Canada, Puerto Rico, Australia, and the Virgin Islands, as is the case here, is overbroad and unreasonable. *See Dunlap*, 2011 WL 3586225, at *8; *AAMCO Transmission, Inc., v. Graham*, Nos. 89-4976 & 89-6379, 1990

        WL 118050, at *3 (finding restrictive covenant that prevented opening of new automotive repair center within ten-mile radius of any AAMCO in U.S. to be overbroad; limited restriction to Denver and Aurora metropolitan areas).

26. "[W]here the covenant imposes restrictions broader than necessary to protect the employer, [the Pennsylvania Supreme Court has] repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254 (Pa. 1976); *see Dunlap*, 2011 WL 3586225, at *8 ("Pennsylvania courts will modify, or blue pencil, non-compete agreements if the restriction is too broad but the franchisor is entitled to some protection.").

27. Accordingly, while I agree with the majority of the terms of the non-competition agreement, the three-mile radius limitation will apply only to other Cottman centers within the Greater Pittsburgh Area; however, the Defendants' Center will remain subject to the ten-mile radius restriction.

### E.   Attorney Fees

28. In addition to compensatory damages, Cottman requests attorney fees.

29. The Lanham Act allows a court to award reasonable attorney fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117. "Exceptional cases involve culpable conduct on the part of the losing party, 'such as bad faith, fraud, malice, or knowing infringement.'" *Acumed LLC v. Advanced Surgical Serv., Inc.*, 561 F.3d 199, 230 (3d Cir. 2009) (quoting *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir. 2000).

30. Here, the Defendants continued to use the "Cottman" trademarks after the License Agreement was terminated and throughout the pendency of this suit, to which the Defendants offered no defense. Such continued use clearly constitutes knowing and willful infringement. Therefore, I conclude that attorney fees are appropriate.

### III. CONCLUSION

For the reasons stated above, a permanent injunction—modified to reflect a reasonable geographic limitation—will be issued against the Defendants, and Cottman will be awarded compensatory damages and reasonable attorney fees. An appropriate order follows.